_____

JACK JUNNIE THOMPSON,

       Plaintiff,

                                    Case No.  1:16-cv-988

v.

                                    HON. GORDON J. QUIST

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## OPINION

       This is a social security action brought pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner) regarding Plaintiff's claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

## STANDARD OF REVIEW

       The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff first applied for benefits on October 23, 2006, alleging that he was disabled due to blindness in his right eye. Plaintiff alleged that as a result of this blindness, he could not focus and did not have the full range of perception. This application resulted in an unfavorable decision by an ALJ on April 29, 2009. Plaintiff appealed to federal court and successfully obtained a reversal of the ALJ's decision on February 25, 2011. The decision remanding the case directed the Commissioner to "re-evaluate both plaintiff's credibility with respect to eye pain and his RFC with respect to his limitations for working in a lighted environment." *Thompson v. Comm'r of Soc. Sec.,* No. 1:10-cv-2 (W.D. Mich. Feb. 2, 2011) (ECF Nos. 13-14) (hereinafter *Thompson I*). Consistent with this order, the Commissioner remanded the case to an ALJ for a new decision.

On October 12, 2011, an ALJ again found Plaintiff was not disabled. Plaintiff, in turn, again sought review in federal court, and the parties consented to a final decision by a magistrate judge. On March 31, 2014, Magistrate Judge Hugh Brenneman, Jr. found the Commissioner's decision was again not supported by substantial evidence, and accordingly remanded the case. This time, the Commissioner was directed to "re-evaluate the opinions of plaintiff's treating physician, Dr. Cowden, as well as the vocational evidence at the fifth step of the sequential process." *Thompson v. Comm'r of Soc. Sec.*, No. 1:13-cv-67 (W.D. Mich. Mar. 31, 2014) (ECF No. 20) (hereinafter *Thompson II*).

After Judge Brenneman's decision, the Appeals Council remanded the case to the ALJ for further proceedings. (PageID.1101-1102.) On January 28, 2015, Plaintiff appeared with his counsel before ALJ Donna Grit for an administrative hearing, at which time Plaintiff and a vocational expert (VE) both testified. (PageID.890–960.) On August 27, 2015, the ALJ issued a partially favorable written decision that concluded Plaintiff was not disabled prior to May 21, 2015, but became disabled on that date based on statutory blindness. Plaintiff continued to be disabled because of his statutory blindness through the date of decision. (PageID.856–887.) On June 10, 2016, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision in the matter. (PageID.843–846.) Thereafter, Plaintiff initiated this action under 42 U.S.C. § 405(g).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a

---

[1]1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.    An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC). *See* 20 C.F.R. §§ 404.1545, 416.945.

Plaintiff has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Grit determined that prior to May 21, 2015, Plaintiff's claim failed at step five. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (PageID.864.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of status post penetrating keratoplasty of the right eye with decreased depth perception and photophobia and headaches, keratoconus and reduced vision left eye, sleep apnea, hypertension (HTN), obesity, mild restrictive lung capacity related to obesity, glaucoma, myofascial back pain, depression, and alcohol abuse. (PageID.864.) At step three, the ALJ found that prior to May 21, 2015, Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments found in 20 C.F.R. Pt. 404, Subpt. P, App.

---

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. §§ 404.1520(f), 416.920(f)).

1. (PageID.864–866.) At step four, the ALJ determined that prior to May 21, 2015, Plaintiff retained the RFC based on all the impairments:

> to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) of the Regulations. He could not use ladders, ropes, or scaffolds, and could perform no standing rapidly from seating position, only occasional crouching and crawling, and frequent balancing, stooping, and kneeling. Because of limited depth and limited near and far acuity, the claimant was precluded from reading fine print, but he was able to read ordinary book and newspaper print, could view computer screen, could determine the shape and color of objects, and could sort, handle, and use paper files. He was unable to work at unprotected heights and he could work with dangerous moving machinery. He was unable [sic] perform any assembly line work with objects presenting from either the right or left sides. He needed to be able to wear an eye patch over the right eye at work and to avoid more than occasional exposure to extremes of cold, heat, and humidity. The claimant was able to understand, remember and perform simple tasks and he was able to make simple decisions and to adapt to routine changes in the workplace.

(PageID.866.) Continuing with the fourth step, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (PageID.876.) At the fifth step, the ALJ concluded that prior to May 21, 2015, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed despite his limitations. In making this finding the ALJ relied on the testimony of the VE from the administrative hearing. *See Richardson*, 735 F.2d at 964. The VE testified that Plaintiff could perform work in the following representative jobs: packaging worker (2,800 regional and 33,000 national positions), information clerk (2,500 regional and 36,000 national positions) and office helper (1,800 regional and 25,000 national positions). (PageID.947–951.) Based on this record, the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy prior to May 21, 2015. (PageID.877–878.)

The ALJ determined that as of May 21, 2015, however, Plaintiff successfully established disability. The ALJ based this determination on a consultative ophthalmologic

examination from the same date that found the severity of Plaintiff's visual impairment met the criteria of section 2.02 of the listing of impairments.

Accordingly, the ALJ determined that Plaintiff was not disabled before May 21, 2015, but became disabled on that date and remained so through the date of decision. (PageID.878.)

## DISCUSSION

### 1. The ALJ's Evaluation of the Medical Opinion Evidence.

In support of his application for benefits, Plaintiff submitted several opinions from Dr. Thomas P. Cowden, M.D., his treating physician. The ALJ's evaluation of these opinions in *Thompson II* was the main basis for Magistrate Judge Brenneman's previous reversal. Plaintiff contends the ALJ failed to follow the Court's remand order and thus made the same errors in this case. The Court disagrees.

By way of background, the treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating physician if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported

by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller*, 1991 WL 229979 at *2 (citing *Shavers,* 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "'are not well-supported by any objective findings' and are 'inconsistent with other credible evidence'" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Id.* at 376–77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine what weight to give the opinion. *Gayheart*, 710 F.3d at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007).

The ALJ provided a thorough analysis of Dr. Cowden's opinion:

In April 2011, Dr. Cowden, the treating corneal specialist, opined the claimant could continuously lift and carry between 50 and 100 pounds and that he did not require the use of a cane. The claimant was able to use the phone, was unable to read very small print, read ordinary newspaper or book print, view a computer screen, determine differences in shape and color of small objects, shop, travel without assistance, use public transportation, create a simple meal, take care of personal hygiene, and sort, handle, or use paper files (Exhibit 24F).

I would have assigned this statement significant weight, except for an indication in the statement that the claimant does not have the ability to hear and understand simple instructions. The comment on the claimant's ability to hear appears to be a typographical error and is directly contradicted by the claimant's own statement that he uses the telephone and the lack of any hearing related claim. I do not believe that it is necessary to re-contact this source concerning the meaning of this limitation. In addition, the residual functional capacity finding (finding #5) includes limitations related to all of the claimant's impairments, including sleep apnea, obesity, and breathing difficulties, which are outside of the area of expertise of ophthalmologist Cowden, a corneal specialist. Primarily however, this opinion is given little weight because Dr. Cowden is not reliable, and has offered contradictory information to the Commissioner of Social Security.

In September 2011, I received a second opinion from Dr. Cowden and that opinion is at odds with those provided by the doctor only approximately five months previously. I am less than persuaded by the change in the limitations, given no actual treatment notes or rationale was offered to explain the change in the proposed restrictions or a change in condition between April of 2011 and September of 2011.

Dr. Cowden's September 2011 statement in exhibit 32F summarizes the claimant's medical history and offers recommendations for proposed restrictions that differ somewhat from the doctor's April 2011 statement. In September 2011, the doctor opined that:

> He [the claimant] would not be limited in the areas of standing, walking or lifting. He would be limited to task[s] not requiring depth perception of peripheral vision in his right eye. He would require the option to wear dark glasses to limit the effect of his light sensitivity (Exhibit 32F/2).

The limitations of no depth perception and no peripheral vision of the right eye are effectively included in the residual functional capacity finding of this decision, which assumed no functional use of the right eye. The September 2011 opinion indicates the claimant would require the option to wear dark glasses to limit the effects of his light sensitivity.

In December 2014, ophthalmologist Cowden provided a statement at the request of claimant's counsel. Dr. Cowden agreed with the statement that the claimant had no vision of any real significance of the right eye and that the claimant might be a candidate for a corneal transplant, although he was not a great candidate because at least two [procedures] had already failed and the main focus of treatment was maintaining comfort of the right eye. Dr. Cowden stated that the claimant has keratoconus of [sic] and explained that keratoconus is a weakening of the corneal tissue, corneal stroma, causing it to be irregular, steep, and thin, causing an irregular astigmatism. It is difficult to focus vision with glasses alone so it requires a contact lens to help focus vision onto the retina; if the contact lens does not work, that is when a transplant is done. Dr. Cowden stated that one of the characteristics of keratoconus was blurred vision, but that he did not think that sensitivity to light was one of the characteristics of keratoconus itself. The blurriness might inhibit a person's ability to do things like read or work on objects in front of him (Exhibit 41F). I asked Dr. Cowden to clarify his prior opinion statements. Dr. Cowden indicated that he did not feel confined by the space limitations on his earlier April 20 II form, although he would clarify his statement. In 2015, Dr. Cowden indicated that, based on previous evaluations, as the claimant had not been seen recently, the claimant's right eye had 20/HM (hand motion) vision which is not legal driving etc. due to graft failure and not able to undergo further treatment with me. The vision of the left eye was 20/70, possibly able to be corrected with a contact lens, but the claimant was unable to comply with this.

Dr. Cowden indicated that the April 2011 statement's notation of hearing limitation was in fact a clerical error and that he had not seen or been treating a hearing disorder.

Regarding the September 2011 statement, Dr. Cowden indicated the claimant was sensitive to light and that sunglasses or tinted glasses would benefit him. Dr. Cowden indicated further that he did not prescribe sunglasses or dark glasses, but that the claimant's [sic] might see an optometrist or optician for the dark glasses. Dr.

Cowden could not offer an opinion concerning the current level of function of the left eye and indicated that he had not seen the claimant in many years. The doctor indicated that he could not recall whether the claimant had reported floaters of the left eye (Exhibit 42F/6-8, 10).

In April 2011, Dr. Cowden indicated that the claimant was able to read ordinary newspaper print, view a computer screen, determine differences in shape and color of small objects such as screws, nuts or bolts, shop, travel without a companion for assistance, ambulate without a wheelchair, walker, or two canes or two crutches, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of single handrail, prepare a simple meal and feed himself, care for his personal hygiene, and sort and use paper files. The April 2011 statement did not indicate that he needed dark glasses to perform such tasks.

I asked Dr. Cowden whether he was of the opinion in April of 2011 that the claimant needed dark glasses to perform these tasks. Dr. Cowden responded that he did not know and indicated that I should check the records. Dr. Cowden indicated further that, on last evaluation, he believed so, at the claimant's own discretion. I asked the doctor whether the use of dark glasses would prohibit the claimant from performing any of the tasks in the preceding paragraph, to which he responded that he did not know; that was outside of his medical expertise and that he was not able to evaluate that clinically.

Further, I referred to the December 15, 2014 deposition statement that sensitivity to light was not one of the characteristics of keratoconus itself. I asked Dr. Cowden whether he had determined the claimant's reported light sensitivity and Dr. Cowden responded that it was probably due to the failed corneal transplant of the other eye. Dr. Cowden referred to this explanation when I asked for an explanation between the December 2014 statement that keratoconus does not cause light sensitivity and the earlier statement from September 2011 that the claimant's pain, tearing and light sensitivity complaints were reasonably explained by his condition going back to at least his first corneal transplant, as well as the underlying condition of keratoconus.

I assign Dr. Cowden's four statements from April 2011, September 2011, December 2014, and February 2015 (in Exhibits 24F, 32F and 41F-42F little weight. I cannot assign any opinion statement

controlling weight because of the internal inconsistencies between the statements and the lack of supportability with the record as a whole. While I appreciate Dr. Cowden's answers to my questions in Exhibit 42F, his responses do not lend any credibility or reliability to his opinion statements, which is unfortunate since as a qualified treating source, had he taken time to formulate opinions, rather than providing conflicting information, it would have been helpful.

Regarding pages 5 through 8 of Exhibit 42F, I can only conclude, at least at that point in time, that Dr. Cowden is of the opinion that the claimant could, in fact, read ordinary newspaper print, view a computer screen, determine differences in shape and color of small objects such as screws, nuts or bolts, shop, travel without a companion for assistance, ambulate without a wheelchair, walker, or two canes or two crutches, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of single handrail, prepare a simple meal and feed himself, care for his personal hygiene, and sort and use paper files, and that the claimant might wear non-prescription sunglasses or dark glasses at his discretion while performing such tasks. The explanations for the change in his opinion, as noted above, are not supported by the record or my attempts to clarify his opinion.

(PageID.872–875.) The extensive discussion laid out above provides substantial evidence in support of the ALJ's decision.

Plaintiff's main contention is that the ALJ seemed to provide the same analysis that was deemed faulty in *Thompson II*. Though the discussion in the instant decision may have used similar language, at first, to discuss the opinion, the ALJ plainly went beyond the faulty analysis that was present in *Thompson II*. As the Commissioner points out, the ALJ clearly articulated her primary reason for discounting the opinion when stating "Primarily however, this opinion is given little weight because Dr. Cowden is not reliable, and has offered contradictory information to the Commissioner of Social Security." (PageID.873.) This shows the Commissioner clearly understood, and followed, Judge Brenneman's remand order. Moreover, Judge Brenneman suggested that the Commissioner could re-contact Dr. Cowden. Though this was not necessary in

order to re-evaluate the opinion, the ALJ did in fact re-contact the doctor. Accordingly, Plaintiff's contention that the Commissioner failed to comply with the remand order in *Thompson II* is without merit.

Plaintiff's counsel next complains that "[i]n this writer's 32 years of working in the field of Social Security, he has never seen such a blatant attempt by an ALJ to manipulate the evidence." (PageID.1613.) Later, counsel asks this Court to "send" the ALJ "a message." (PageID.1619.) Counsel's contention is not well taken. There is no evidence the ALJ manipulated the evidence in this case. To the contrary, the ALJ gave a thorough and accurate discussion of the medical evidence of record. Moreover the interrogatory sent to Dr. Cowden does not appear to be out of the ordinary. It contains only eleven simple questions over a span of seven pages with generous space given for the doctor to provide his answers. (PageID.1472–1478.) The rest of the seventy-nine page document contains only copies of the doctor's records and was clearly intended to remind the doctor of his treatment of Plaintiff and his previous statements.

Despite the lengthy history of this case, and the ALJ's lengthy discussion of the opinions, there is little here that is actually in conflict with the ALJ's decision. Though the ALJ assigned them little weight, Dr. Cowden's opinions are largely consistent with the ALJ's ultimate RFC determination. Indeed, when the limitations provided by the doctor are distilled down, there are only two differences between the RFC and Dr. Cowden's opinions: Plaintiff had an unspecified hearing limitation and Plaintiff would need the option to wear dark glasses. All other limitations provided by Dr. Cowden appear to be fully contained within the RFC. The April 2011 evaluation, for example, did not comment on Plaintiff's exertional abilities. (PageID.805.) The doctor noted that Plaintiff could not read very small print, but Plaintiff could read ordinary newspaper or book print, could view a computer screen, and could determine differences in shape and color of small

objects.  (PageID.807.)  Thus Dr. Cowden commented that Plaintiff retained the abilities to shop, travel without a companion, prepare meals, climb steps, sort papers, and care for his personal hygiene.  (PageID.809.)  All this is consistent with the RFC.  Similarly the ALJ indicated she had adopted the limitations of no depth perception and no peripheral vision of the right eye from the September 2011 opinion into the RFC, and Plaintiff does not argue that the ALJ in fact failed to do so.  Turning to the December 2014 statement, there is a lengthy discussion of Plaintiff's condition, but the statement contains little by way of offering any functional limitations from this condition.  (PageID.1489–1495.)  Similarly, in his fourth and final opinion, Dr. Cowden declined to give an opinion on Plaintiff's functional abilities.  (PageID.1477.)  Accordingly, the only restrictions from Dr. Cowden that were not adopted by the ALJ appear to be the hearing limitation and the option for wearing dark glasses.

As for the hearing limitation, Dr. Cowden clarified that this was a typo.  Plaintiff does not argue otherwise.  Thus the ALJ did not err in failing to adopt this portion of the opinion.  It is true the ALJ gave the remaining portion of the opinion only little weight.  But despite doing so, the ALJ's RFC is consistent with the remaining limitations contained in the April 2011 opinion.  Thus any error here is harmless.  *See Wilson*, 378 F.3d at 547.

The issue falls to whether Plaintiff needed the option to wear dark glasses.  It appears, from the VE testimony, that this additional limitation would not have precluded Plaintiff's ability to engage in substantial gainful activity.  (PageID.954.)  But in any event the ALJ provided a good reason for discounting Dr. Cowden's opinion on the issue.  The ALJ noted that the doctor had previously stated Plaintiff's keratoconus did not cause light sensitivity.  When asked to explain why Plaintiff would then need the option to wear dark glasses, the doctor could only speculate.  (PageID.1476.)  Accordingly, the ALJ appropriately observed the reliability of the doctor's opinion was in doubt.

For all the above reasons, the Court finds the ALJ provided good reasons, supported by substantial evidence for assigning Dr. Cowden's opinions less than controlling weight. Plaintiff's first claim of error is accordingly denied.

## 2. Plaintiff's Allegations.

At the administrative hearing, Plaintiff alleged that he was impaired to an extent far greater than as was ultimately recognized by the ALJ. After summarizing Plaintiff's allegations, the ALJ discussed them, extensively, as follows.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to May 21, 2015, for the reasons explained in this decision.
>
> The claimant has sought and received rather infrequent treatment for his impairments other than his vision, which is clearly his major impairment. The treatment for vision problems has been infrequent and it has only become more infrequent since my October 2011 decision. Despite the subjective headache complaints, the treatment for the same remains almost entirely unimpressive. Claimant's statement that Flexeril makes him sleepy in the daytime is curious in that he also stated that he has insomnia at night and the Flexeril is not sufficient to make him sleepy at nighttime.
>
> While the claimant has a significant visual impairment, the record as a whole does not fully support that the claimant's vision is nearly as limited as the claimant has alleged or that his vision difficulties reasonably restrict his functioning as much as alleged. The claimant's ability to pass the vision portion of the state driving test as recently as June 2011 completely undercuts his claim that he cannot see out of his left eye sufficiently, that he has developed photophobia in the left eye, or that the combined visual impairment of both eyes renders him unable to do anything. The claimant had the right eye flap-surgery in October 2011, with a follow-up vision appointment in early 2012 and followed by a vision exam in March 2013.
>
> There is almost no evidence in the record of medical treatment since the October 2011 decision about excessive tearing of the eye. or

> about the use of either dark glasses or sunglasses. It appears that the eye flap surgery in that same month was at least partially successful in treating the adverse symptoms (i.e. drainage, leaking) of the right eye even though its vision was not restored. There is very little treatment for the myofascial back pain or any other musculoskeletal sign or symptom.

(PageID.871–872.)     As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's assertions of disabling pain and other limitations are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative

15

record." *Id.* (citing *Walters*, 127 F.3d at 531). In making this finding, social security regulations note that the Commissioner will consider the following factors: (1) a claimant's daily activities, (2) the location, duration, frequency, and intensity of a claimant's pain or other symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of any medication a claimant takes or has taken to alleviate pain and other symptoms, (5) treatment, other than medication, a claimant receives or has received for relief of pain or other symptoms, (6) any measure a claimant uses or has used to relieve pain or other symptoms, such as lying on one's back, shifting positions, or sleeping on a board, and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7 (S.S.A. Mar. 16, 2016); *see also* SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 F. App'x at 801 (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

Plaintiff begins this claim of error by raising the now-familiar objection that the ALJ used flawed "boilerplate language" to evaluate his credibility. Plaintiff relies on the Seventh Circuit decision in *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), which criticized the Agency's use of this language in ALJ decisions:

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above"—above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards. The administrative law judge based his conclusion that Bjornson can do sedentary work on his determination that she was exaggerating the severity of her headaches. Doubts about credibility were thus critical to his assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be. In this regard we note the tension between the "template" and SSR 96–7p(4), www.ssa.gov/OP_Home/rulings/di/01/SSR96–07–di–01.html (visited Jan. 4, 2012), which states that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." The applicant's credibility thus cannot be ignored in determining her ability to work (her residual functional capacity, in SSA-speak).

*Id.* at 645–46. The court also opined that "[t]he Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'" *Id.* at 646.

Notwithstanding the Seventh Circuit's criticism of this "opaque boilerplate," *id.* at 644, that court did not summarily reverse the ALJ's decision for using the boilerplate. *See id.* at 649. Rather, the court rejected the ALJ's credibility determination because of the specific reasons the ALJ cited. *See id.* at 646 ("[t]he administrative law judge based his doubts about Bjornson's

credibility on his assessment of the medical reports or testimony of the three doctors whom we've mentioned"). Similarly, the ALJ's use of the language in this case is not, in and of itself, grounds for reversal. Rather the "chief concern with the popularity of this template . . . is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 260 (6th Cir. 2015) (emphasis in original). Courts in this district have consistently held as much. *See*, *e.g., Stamps v. Comm'r of Soc. Sec.*, No. 1:15-cv-0557, 2016 WL 4500793, at *7 (W.D. Mich. Aug. 29, 2016); *Ralph v. Comm'r of Soc. Sec.*, No. 1:15-cv-90, 2016 WL 74422, at *7 (W.D. Mich. Jan. 6, 2016); *Delp v. Comm'r of Soc. Sec.*, No. 1:13-cv-840, 2014 WL 4748696, at *6 (W.D. Mich. Sept. 24, 2014); *Carter v. Comm'r of Soc. Sec.*, No. 1:12-cv-1370, 2014 WL 1213744, at *6 (W.D. Mich. Mar. 24, 2014); *Rich v. Comm'r of Soc. Sec.*, No. 1:12-cv-255, 2013 WL 5329515, at *4 (W.D. Mich. Sept. 23, 2013). Accordingly, the Court finds no error in the first paragraph of the ALJ's credibility discussion because the ALJ followed it with an additional discussion of several specific reasons.

Plaintiff makes two arguments concerning the remainder of the ALJ's credibility discussion. First, he contends the ALJ erred by referencing his testimony that he had passed a vision test when he renewed his driver's license. (PageID.973.) It appears that Plaintiff was given some accommodation, but nonetheless passed the exam (albeit without renewing his chaufferur's or commercial license). Even with these accommodations, Plaintiff's ability to pass such a test undermines his allegations towards his restricted vision. Plaintiff's reference to *Thompson I* is not well taken. In that decision, the magistrate merely noted that neither Plaintiff's regular license nor his chauffeur's license had been revoked and Plaintiff had not surrendered his licenses. (*Thompson I,* PageID.71.) This is much different than Plaintiff's admission that he had subsequently passed a vision test.

Second, Plaintiff contends that the ALJ failed to consider his ability to afford treatment. The above credibility excerpt shows the ALJ applied the well-established general rule that a claimant's failure to seek treatment over an extended period of time is a factor to be considered against the claimant's assertion of a disabling condition. *See Strong v. Soc. Sec. Admin.,* 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment" and "[a] failure to do so may cast doubt on the claimant's assertions of disabling pain.");[2] *see also* SSR 96–7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ."). 1996 WL 374186, at *7 (S.S.A. July 2, 1996). SSR 96–7p states that before drawing an adverse inference from the claimant's failure to seek or pursue regular medical treatment, an ALJ must first "consider[ ] any explanations the individual may provide or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." 1996 WL 374186, at *7. At the hearing, Plaintiff briefly mentioned the issue of "bills" with Dr. Cowden. (PageID.909.) But he did not testify regarding any specific instance where he sought medical treatment and it was denied because he could not afford it. Moreover, Plaintiff representations that he has been unable to obtain health insurance contradict his earlier admissions that he did have insurance. (*See* PageID.66, 997.) Nonetheless, at the hearing, the ALJ acknowledged that Plaintiff's ability to afford treatment was an issue. (PageID.907.) This, along with the fact that the ALJ noted she considered all symptoms according to the requirements of, among other things, SSR 96–7p, indicates the ALJ was well aware of, and indeed complied with, her obligation under the ruling. (PageID.870.) For

---

[2] The rule is not without exception. "In some circumstances, of course, a failure to seek examination or treatment may say little about a claimant's truthfulness." *Strong*, 88 F. App'x at 846 (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 2004)). In this case, there is no evidence that Plaintiff's impairments were so severe that they prevented him from seeking examination or treatment.

all the above reasons, the Court finds no compelling reason to disturb the ALJ's credibility determination. *See Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

### 3. The ALJ's Evaluation of the VE's Testimony.

Finally, Plaintiff contends that the ALJ erred by failing to follow the VE's testimony at the administrative hearing in response to additional hypothetical questions in which Plaintiff would require to work in an environment where the lightening was darkened to that of a running cinema. (PageID.954–955.) The ALJ was not required to adopt this testimony.

An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through the testimony of a VE in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *See Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632 (6th Cir. 2004); *Varley*, 820 F.2d at 779. However, a hypothetical question need only include those limitations which the ALJ accepts as credible. *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into [her] hypotheticals." *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994).

Here the ALJ was not bound by the VE's response to a hypothetical question from Plaintiff's counsel which included limitations she found were not credible and were unsupported by the record. Instead the ALJ adopted the VE's testimony in response to a hypothetical including those limitations the ALJ ultimately accounted for. This testimony accordingly provides substantial evidence in support of the ALJ's decision. This claim of error is therefore denied.

**CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision will be **AFFIRMED**. A separate judgment shall issue.


Dated:  August 15, 2017        /s/ Gordon J. Quist    
                GORDON J. QUIST
                UNITED STATES DISTRICT JUDGE